## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARCELLA COOLIDGE, individually; and**
**GABRIELLE VALDEZ, as Personal Representative**
**of the Estate of DEREK A. HARRISON, deceased,**

    **Plaintiffs,**

**v.**                                **Case No. _____**

**THE UNITED STATES OF AMERICA,**

    **Defendant.**

### COMPLAINT FOR WRONGFUL DEATH AND LOSS OF CONSORTIUM

Plaintiffs, Gabrielle Valdez, as personal representative for the wrongful death claims of Derek A. Harrison, deceased; and Marcella Coolidge; through counsel, McGinn, Montoya, Love & Curry, P.A. and Calvin J. Harris, Esq.; state as follows for their claims against the Defendant, the United States of America:

### PARTIES

1.    Derek A. Harrison died October 17, 2018 at the age of 29 after the agents of the United States government in the Navajo Department of Corrections Shiprock, New Mexico facility chose not to get him help for his mental health crisis and attempted suicide and left him unmonitored and alone in a cell with the means to hang himself despite knowing he was suicidal.

2.    Plaintiff Gabrielle Valdez is the duly appointed personal representative for the wrongful death claims arising from the death of Derek A. Harrison, pursuant to the New Mexico Wrongful Death Act, NMSA 1978, Section 41-4-1 *et. seq.*, and is a resident and domiciliary of Bernalillo County, New Mexico.

3.      Plaintiff Marcella Coolidge is Derek A. Harrison's mother and is a resident and domiciliary of Shiprock, San Juan County, New Mexico.

4.      Defendant United States of America ("USA"), through its various agencies and departments, including the Department of Interior and the Bureau of Indian Affairs, is responsible for funding, overseeing, and monitoring detention facilities operated by tribal governments pursuant to contracts with those tribal governments.

5.      The Bureau of Indian Affairs ("BIA") is an agency of the U.S. Department of the Interior and is the agency that is directly responsible for funding, overseeing, and monitoring detention facilities operated by tribal governments.

6.      The Navajo Nation operates the Navajo Department of Corrections ("DOC"), including the Shiprock DOC facility, under a self-determination contract made pursuant to Pub. L. No. 93–638, codified at 25 U.S.C. § 5321 *et seq.* ("638 Contract").

7.      The Navajo Nation has contracted to operate the Navajo Police Department under a separate 638 Contract.

8.      Defendant USA is liable for non-medical torts arising out of the performance of 638 Contracts by employees and agents of the Navajo Department of Corrections and Navajo Police Department and is therefore the appropriate defendant in this case.  25 C.F.R. § 900.204.

9.      Defendant USA is liable for the acts and omissions of the BIA and its respective employees, agents, apparent agents, and contractors, pursuant to 28 U.S.C. Section 2679(b) and the doctrines of agency and/or *respondeat superior*.

10.     Defendant USA is liable for the acts and omissions of the Navajo Department of Corrections and the Navajo Police Department and their respective employees, agents, apparent

2

agents, and contractors, pursuant to 25 C.F.R. § 900.204 and the doctrines of agency and/or *respondeat superior*.

11.     At all material times, the employees and/or agents of the Navajo Police Department and Navajo Department of Corrections whose actions and omissions are referenced in this Complaint were employees or agents of their respective departments and were acting within the course and scope of their employment or agency.

### JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the wrongful death claims brought on behalf of the Estate of Derek Harrison under 28 U.S.C. Section 1346(b).

13.     This Court has supplemental jurisdiction over the loss of consortium claim of Plaintiff Coolidge pursuant to 28 U.S.C. Section 1367(a).

14.     Pursuant to 28 U.S.C. Section 2679(b) and 25 C.F.R. Section 900.204, Defendant USA is the proper defendant for claims arising from the wrongful acts and omissions of the Navajo Department of Corrections and the Navajo Police Department, as well as for claims arising from the wrongful acts and omissions of the BIA and its agents and employees.

15.     The acts and omissions giving rise to Plaintiffs' claims occurred in New Mexico.

16.     Pursuant to 28 U.S.C. Section 1402(b), the United States District Court for the District of New Mexico in Albuquerque, New Mexico is the appropriate venue for this matter.

17.     The substantive law governing this action is the law of the State of New Mexico pursuant to 28 U.S.C. Section 1346(b)(1).

18.     Plaintiffs' claims arise from Defendant's wrongful acts and omissions related to Decedent Derek Harrison's arrest in Shiprock on October 10, 2018, his confinement at the Shiprock DOC from October 10, 2018 to October 15, 2018, and his death on October 17, 2018.

19.     As required by 28 U.S.C. Section 2675(a), Plaintiffs timely presented the claims made herein to the U.S. Department of the Interior on October 5, 2020, which tolled the two-year statute of limitations on Plaintiffs' claims under 28 U.S.C. § 2401(b).

20.     Defendant USA did not make a final disposition of the claim within six months and has still not made a final determination.

21.     Defendant's failure to make a final disposition of the claim within six months is deemed a final denial of the claim, and Plaintiffs have therefore satisfied all pre-lawsuit requirements and may file this lawsuit in this Court.  28 U.S.C. § 2675(a).

## FACTS

22.     The purpose of the Navajo Department of Corrections, according to the DOC's Plan of Operation, its founding document, is "to provide for the health, safety and welfare of all adults and juveniles incarcerated within the territorial jurisdiction of the Navajo Nation."

23.     The responsibility for funding and maintaining the law enforcement and detention functions within the Navajo Nation ultimately belongs to the federal government, as determined by its trust responsibilities under federal law and the 1868 Treaty Between the United States of America and the Navajo Nation.

24.     The Navajo DOC and its Shiprock facility depend on funding from and oversight by the BIA, an agency of Defendant USA, to pay staff, provide training and supervision, and to meet the basic human needs of the people who are incarcerated there.

25.     Shiprock DOC is one of 88 tribal detention facilities that are either operated by the BIA or funded by the BIA and operated by tribes pursuant to 638 Contracts.

26.     Tribal detention centers that receive federal funding and that are operated pursuant to 638 Contracts, including Shiprock DOC, are required to follow rules and standards set by the federal government.  25 C.F.R. § 10.3.

**Standard of care for tribal detention centers**

27.     Under the DOC's Plan of Operation, the DOC has an obligation to:

      a.     Maintain humane conditions for all inmates;

      b.     Provide intervention services to inmates; and

      c.     Train and supervise jail staff.

28.     The rules governing tribal detention centers are published in a national handbook that incorporates the standards of the American Correctional Association.

29.     Over 25 years before Derek Harrison's death, a lawsuit filed in the District Court of the Navajo Nation in Window Rock, Arizona brought to light evidence of chronic and repeated underfunding and neglect by the BIA, especially that of the Bureau's decisions not to adequately fund detention facilities under 638 Contracts.

30.     The lawsuit resulted in a consent decree, filed November 17, 1992 with the Window Rock District Court mandating changes to the inhumane conditions in Navajo detention facilities, which included extreme overcrowding and understaffing.  Consent Decree, *Silver v. Pahe*, No. WR-CV-235-92 (Nav. Nat'n Dist. Ct., Window Rock, AZ, Nov. 17, 1992).

31.     The rules governing tribal detention centers, together with the Plan of Operation and the Consent Decree, reflect the standard of care for the operation of those detention centers.

32.     To meet the standard of care, a detention center like the Shiprock DOC must:

      a.     Have enough staff present at all times, including a designated supervisor, to ensure the security, custody, and supervision of inmates and to comply with policies and procedures;

b.    Train staff, both before they assume their duties and on a continuing basis, on supervision of inmates, signs of suicide risk, and suicide prevention;

c.    Maintain a suicide-prevention program that includes specific procedures for handling intake, screening, identifying, and continually monitoring inmates who are at risk of suicide;

d.    Before accepting custody of an inmate, confirm the inmate is legally committed to the facility and that the inmate is not in need of immediate medical attention;

e.    Ensure each inmate undergoes a mental health evaluation and suicide risk assessment by health-trained staff or qualified health care personnel upon the inmate's arrival at the facility;

f.    Determine, based on the mental health evaluation and suicide risk assessment, whether the inmate should be refused admission until medically cleared; cleared for general population; cleared for general population with prompt referral to appropriate medical or mental healthcare services; or referred to medical or mental health care services for emergency treatment;

g.    Require that inmates placed on suicide watch are seen by a mental health care provider as soon as possible, but no later than 72 hours after being placed on suicide watch;

h.    Train and require staff to monitor a suicidal inmate for behavior that suggests a need for an increased level of services, such as hopelessness, anxiety, increasing agitation, or depressive psychosis;

i.    Ensure corrections officers and administrators never take lightly an inmate's suicide threats or attempts, or any information or hints from other inmates about an inmate being potentially suicidal;

j.    Require staff assigned to suicide watch to communicate with and continuously monitor suicidal inmates;

k.    Maintain a uniform written policy regarding high-risk prisoners providing for five-minute inspection rounds;

l.    Honor and act in a timely fashion upon legitimate requests for medical or psychological care by taking the inmate to an appropriate health professional; and

m.    Send inmates to clinical services in an appropriate outside setting when the necessary mental health care is not available at the jail.

33.     Additionally and as further evidence of the standard of care, under the express terms of the 638 Contract for the Navajo DOC, the administration of a Navajo detention center is required to ensure all detainees are screened for a risk of suicide at the time of booking, and, when a risk is identified, corrections staff are required to make an emergency referral to the Indian Health Service for evaluation by a health care professional, with the detainee being continuously monitored until the assessment is done.

**Defendant's neglect of tribal detention facilities, including Shiprock DOC**

34.     For many years, the BIA has chosen to ignore its responsibilities to tribal detention facilities, including Shiprock DOC.

35.     The BIA, in disregard for its responsibilities and for the health and safety of Native people, has chosen not to take the steps necessary to ensure facilities like Shiprock DOC are adequately funded, staffed, and overseen, taking a laissez-faire approach that has left these facilities poorly equipped, understaffed, and unaccountable.

36.     The problems that led to the 1992 Consent Decree have persisted in tribal detention centers across the country for which the BIA is responsible.

37.     The U.S. Department of the Interior's Office of the Inspector General conducted an intensive investigation in 2003 involving hundreds of interviews, extensive document reviews, and 27 site visits, including a visit to the Shiprock DOC.

38.     In its report, the OIG noted the BIA's long history of neglect and apathy in its management and oversight of tribal corrections programs, resulting in "serious safety, security, and maintenance deficiencies at the majority of facilities" visited.  U.S. Department of the Interior, Office of the Inspector General, *Neither Safe Nor Secure: An Assessment of Indian Detention Facilities*, Report No. 2004-I-0056, at 3 (September 2004).

39.     The Inspector General's report noted:

> Early in our assessment, it became abundantly clear that some facilities we visited were egregiously unsafe, unsanitary, and a hazard to both inmates and staff alike.  BIA's detention program is riddled with problems and, in our opinion, is a **national disgrace** with many facilities having conditions **comparable to those found in third-world countries**. In short, our assessment found evidence of a continuing crisis of inaction, indifference, and mismanagement throughout the BIA detention program.

*Id*. at 1 (emphasis added).

40.     The Inspector General found that "BIA has failed to provide safe and secure detention facilities throughout Indian Country" and that despite "audits, inspections, reports, and other warnings about the woeful conditions of the detention program, BIA has utterly failed to remedy the problems." *Id.* at 3.

41.     The report further found:

a.     BIA was unaware of 98 percent of the serious incidents, including deaths and suicides, that occurred at the facilities visited by the OIG;

b.     With few exceptions, detention facilities were operating at below minimum staffing levels;

c.     The maintenance backlog was significant, and review of the BIA Division of Facilities Management and Construction maintenance logs revealed numerous inaccurate, improper, and erroneous entries;

d.     BIA haphazardly managed detention program funding, and once funding is distributed to the tribes, it becomes virtually unaccounted for;

e.     Training for detention personnel was inconsistent and unpredictable; and

f.     Basic jail administration procedures and standards were neither followed nor met at most facilities.

*Id*. at 3-4.

42.     The OIG's 2004 report specifically discussed a suicide at the Shiprock DOC that provided notice of the need to implement changes that could have saved lives.

43.    As part of a discussion of the many suicides that have taken place in the BIA's Indian Country detention centers, the OIG included reference to a 2001 suicide at the Shiprock DOC where "[a]n inmate was placed in the isolation cell and left unobserved for 2 hours, during which time he hanged himself. According to the facility administrator, there are no written procedures for handling inmate deaths." *Id*. at 16.

44.    The Inspector General's report further stated:

> Incredibly, an individual detained at the Shiprock facility in 2001 attempted to hang himself seven times using articles of clothing and towels left in the cell. According to the facility administrator, the detention officers' response to these attempts was quite elementary -- if the inmate tried to hang himself with his socks, they would take his socks away; if he tried to hang himself with his towel, they would remove the towel - until the inmate remained in his cell without any clothing or towels.

*Id*. at 18 (emphasis added).

45.    The OIG's 2004 report made other specific references to the unsafe conditions at the Shiprock facility:

     a.    A correctional officer watched as an inmate escaped while she was leading a line of shackled inmates to the courthouse across the street.

     b.    The officer could not pursue the inmate because she was the only officer on duty.

     c.    The OIG's review found no record of the escape or of the inmate's return to the facility.

     d.    A detention officer had been working at the Shiprock facility since 1999 and still had not attended detention officer training (52% of all the detention officers at the sites OIG visited had not received training).

*Id.* at 22.

46.    Another report published by the Inspector General in February 2016, a follow-up to the 2004 report, documented the continued deplorable conditions the BIA had allowed to fester in detention programs funded and/or operated by the BIA.  U.S. Department of the Interior, Office

9

of the Inspector General, *Bureau of Indian Affairs Funded and/or Operated Detention Programs*, Report No. 2015-WR-012 (February 2016).

47.     The 2016 report noted that understaffing, overcrowding, and lack of oversight continued in tribal detention facilities on the Navajo Nation after the 2004 report brought those issues to light, and inmates in these facilities have continued to suffer as a result.

48.     Despite the Consent Decree's requirement that the Navajo Nation request annual funding for at least three on-duty correctional officers for each shift at its detention facilities, the Inspector General's report noted that the Shiprock facility "sometimes has only one or two officers on duty for graveyard or weekend shifts."

49.     This means at times, the Shiprock DOC facility has one officer responsible for overseeing every aspect of a jail with an average daily population of 38 and as many as 51 inmates at peak times.

50.     The 2016 report noted that only one of the five Navajo detention facilities the Inspector General visited during its investigation had been inspected in each of the previous three years by the BIA Office of Law Enforcement Services, which is responsible for conducting operational evaluations for oversight of tribal detention centers operating under 638 Contracts.

51.     This failure was replicated nationwide, as BIA did not conduct 73 percent of the required annual health and safety inspections at the facilities visited by the Inspector General over the three-year audit period.

52.     During the three years the OIG studied for its 2016 report, the Shiprock DOC had not been through a single health and safety inspection.

53.     The OIG reports provided notice to the BIA and the Navajo DOC of the necessity of making changes to prevent needless deaths in Navajo detention facilities.

54.     Given this long history of severe neglect by the BIA and the negligence of the Navajo DOC, the Shiprock DOC facility was not capable of meeting the needs of a person dealing with a mental health crisis.

**Derek Harrison's unanswered pleas for help**

55.     When 29-year-old Derek Harrison's family became worried because he was intoxicated and suicidal, they did what most family members would do to help a loved one: they called police.

56.     On October 10, 2018, Derek's sister, Natasha Coolidge, got a call from their mom, Marcella Coolidge, who was concerned about Derek.

57.     Marcella was in Farmington, New Mexico and asked Natasha to drive to the house in Shiprock to check on Derek and take Marcella's car keys away from the house and to make sure Derek did not use them.

58.     When Natasha got to the house, she saw that Derek was intoxicated and upset about problems with his girlfriend.

59.     After Natasha left with the car keys, she called the house and spoke to her sister Wynona and heard yelling in the background, so she called the Shiprock Police District ("SPD"), a division of the Navajo Police Department.

60.     On her second attempt to reach SPD, Natasha reached a dispatcher and reported the situation.

61.     The employee told Natasha the SPD would send units to the house.

62.     Natasha returned to the house to find Derek in crisis and in an argument with his sister Wynona.

63.     Derek said he was going to kill himself and grabbed a rope-like cable.

64.     Wynona then called police herself to again ask for help for Derek.

65.     The family was concerned because Derek had never threatened suicide before and had always expressed his opposition to suicide.

66.     Derek walked next door to their grandmother's house, where he attempted to hang himself in her shade house.

67.     Wynona, who was still on the phone with Shiprock Police, informed them her brother was intoxicated, suicidal and trying to hang himself.

68.     When SPD officers arrived, Derek's sisters explained what had happened and tried to help direct the officers to Derek.

69.     They found him, interrupting his suicide attempt, and put him in the back of a patrol car.

70.     Derek's sisters again told police what had happened and reiterated that Derek was suicidal and intoxicated.

71.     They also showed the SPD officers where Derek had attempted to hang himself at the shade house, and one of the officers took the rope or cable he had used.

72.     The officers assured the sisters the police would get Derek the help he needed, and they drove off with him in the back of the police car.

**Derek Harrison's Treatment at the Department of Corrections**

73.     Contrary to the police officers' promises to Derek's sisters, he was not provided with a mental health care evaluation, much less the medical and mental health care he needed.

74.     The officers took Derek to the Shiprock DOC facility to be detained as an inmate instead of being transported to a mental health care provider, even though the officers knew he was suicidal and had attempted to hang himself.

75.     Derek told officers he wanted to go to the hospital, but they did not honor his request.

76.     When Derek arrived at the Shiprock DOC, the staff did not perform any mental health evaluation or suicide risk assessment.

77.     Although the standard of care required the facility to place Derek on a suicide watch and continually monitor him, the Shiprock DOC either did not have enough staff members to meet its obligation to provide continuous monitoring, willfully chose not to provide continuous monitoring, or did not properly train staff members to comply with the rules requiring continuous monitoring of suicidal inmates.

78.     Although the standard of care required the facility to ensure Derek—who was there in part because he had tried to hang himself—had no access to any means of hanging himself, the Shiprock DOC placed Derek in a cell with bedsheets.

79.     The Shiprock DOC had a video surveillance system and, if the staff had been monitoring it, they would have seen Derek pacing around his cell in a visibly agitated state on October 15, 2018.

80.     No one went to check on Derek as he was pacing around his cell in a visibly agitated state, despite the jail's knowledge that he was suicidal.

81.     Derek carried out his threats by using a sheet to hang himself.

82.     Despite Derek's hanging being readily visible to anyone monitoring the video surveillance cameras, no one went in to stop him.

83.     Derek hung in his cell for at least 30 minutes before he was found—not by a Shiprock DOC employee, but by an inmate working as a trustee, who reported the hanging to corrections officers, who were booking a new inmate.

84.     An SPD officer who happened to be at the jail when the trustee reported the hanging ran to the upstairs holding cell to assist DOC Detention Sgt. Tino Yazzie while the other DOC officer stayed with the new inmate, who was not yet confined in a cell.

85.     Sgt. Yazzie took Derek down and untied the sheet.

86.     At the SPD officer's direction, Sgt. Yazzie attempted CPR, which was continued by the police officers as they waited for paramedics.

87.     Paramedics transported Derek to the Indian Health Services ("IHS") hospital in Shiprock.

88.     Plaintiff Coolidge learned of her son's hanging when a doctor at the IHS hospital called her on October 15, 2018.

89.     The doctor asked her if she was sitting down and then told her that Derek was in the hospital, that he had nearly died and had his heart restarted at the emergency room, and that he was on life support.

90.     During the late evening October 15, 2018, Derek was airlifted from Shiprock to Albuquerque, where he arrived at Lovelace Medical Center in the early morning hours of October 16, 2018 with his mother, Plaintiff Coolidge, at his side.

91.     Derek's sisters drove to meet them.

92.     No one from the Shiprock DOC or the SPD contacted Derek's family to interview them or provide information.

93.     When Derek's aunt, Gwen Goldtooth, called the Shiprock DOC, Sgt. Yazzie informed her that Derek was "released" and that his property would be released and asked her to pick up his court documents and property.

94.     At Lovelace Medical Center, Derek's family learned he had little remaining brain activity and was entirely reliant on life support.

95.     Derek was in a vegetative state with a severe hypoxic brain injury and with no prospect of any meaningful recovery.

96.     On the evening of October 16, 2018 and after much sorrowful consideration, Derek's mother and sisters decided it was best to remove Derek from life support because "living" in that state would have been against his nature.

97.     Derek was pronounced dead the next morning, October 17, 2018, at 7:59 a.m.

**The efforts by Derek Harrison's family members to find out what happened**

98.     On the drive back to Shiprock after Derek's death, his aunt, Gwen Goldtooth, called the SPD dispatcher and asked to speak to the investigator who investigated Derek's hanging.

99.     After some back and forth, the supervisor for Criminal Investigation Department, Malcolm Leslie, called her back.

100.    Mr. Leslie apologized and said his unit had not been informed of the hanging.

101.    CI Supervisor Leslie was upset that no one from the SPD called him.

102.    Gwen told CI Supervisor Leslie that Derek did not make it, and CI Supervisor Leslie told Gwen someone would contact her.

103.    No one ever did.

104.    No SPD officer or Shiprock DOC officer came to see them at the hospital or check on them after Derek's death, and no one came to apologize, offer condolences, or offer contact information to get in touch.

105.    Derek's death appeared to be of no concern to the people who had chosen not to do anything to prevent it.

106.    On or about October 18, 2018, Plaintiff Coolidge, along with Derek's sisters and aunt, spoke to Criminal Investigator Wilson Charlie.

107.    Mr. Charlie had taken possession of the Shiprock DOC surveillance camera footage of Derek's cell, as well as Derek's personal property.

108.    Mr. Charlie said he was still investigating Derek's death and said he had reviewed video footage, relevant documents, logbooks, and reports.

109.    Mr. Charlie noted he had found some inconsistencies in the documentation and informed them that it appeared Derek had been hanging in his cell for about 30 minutes before he was found by a trustee.

110.    Plaintiff Coolidge, who was still overwhelmed the day after her son's death and in the middle of making funeral arrangements, was shocked by this news.

111.    Mr. Charlie showed the family members a scribbled note Derek had left for his loved ones in which he said he was sorry and that he loved them.

### COUNT I
### NEGLIGENCE BY THE USA THROUGH ITS AGENCY THE BUREAU OF INDIAN AFFAIRS RESULTING IN WRONGFUL DEATH

All previous paragraphs are incorporated herein by reference.

112.    Defendant USA, through its agency the BIA, had a duty to oversee tribal detention facilities that receive funding from the federal government to ensure compliance with rules, regulations, policies, and procedures to protect the lives, health and safety of people detained in those facilities.

113.    Pursuant to federal law and pursuant to the self-determination contract with the Navajo Nation, Defendant USA, through its agency the BIA, had a duty to provide funding,

oversight, auditing, and technical assistance to Navajo detention facilities, including the Shiprock DOC.

114.    Defendant USA, through its agency the BIA, had a duty to use ordinary care in overseeing, funding, auditing, and providing technical assistance to Navajo detention facilities.

115.    Defendant USA, through its agency the BIA, had a duty to ensure that tribal detention facilities were adequately staffed and that their staff received proper training.

116.    Defendant USA, through its agency the BIA, through the BIA's administrators, employees and agents, negligently, recklessly, willfully or wantonly violated its duties of care by:

  a. Not providing adequate funding for Navajo DOC to hire and retain enough staff to maintain humane conditions within Navajo detention centers, particularly for those suffering mental health crises or suicidal ideation;

  b. Not providing oversight of Navajo detention facilities to ensure compliance with rules, regulations, policies, and procedures;

  c. Not providing assistance to Navajo detention facilities despite their longstanding and severe shortcomings in their ability to provide for the health, safety and security of people detained;

  d. Taking no action to address the well-known and documented issues with tribal detention facilities, including understaffing, inadequate or nonexistent training, and the facilities' handling of suicidal inmates or those suffering from mental health crises; and

  e. Having no adequate system to require investigation, changes, or reporting from detention facilities to the BIA after serious incidents, including attempted suicides.

117.    The wrongful acts and omissions of the USA, through its agency the BIA, were a cause of Derek Harrison's death.

118.    It was foreseeable that the wrongful acts and omissions of the USA, through its agency the BIA, would result in the death of Derek Harrison and loss of consortium suffered by Plaintiff Marcella Coolidge.

119.    Defendant USA is liable for those damages recognized under the law, including, but not limited to damages for: wrongful death, lost value of life, pain and suffering, loss of household services, lost earning capacity, funeral expenses, medical expenses, loss of consortium, aggravating circumstances, pre- and post-judgment interest, and other relief as deemed appropriate by the Court.

**COUNT II**
**NEGLIGENCE BY THE NAVAJO DEPARTMENT OF CORRECTIONS AND NAVAJO POLICE DEPARTMENT RESULTING IN WRONGFUL DEATH AND DEFENDANT USA'S VICARIOUS LIABILITY**

All previous paragraphs are incorporated herein by reference.

120.    The Navajo Department of Corrections was directly responsible for the operation and management of the Shiprock DOC facility pursuant to a self-determination contract between the BIA and the Navajo Nation.

121.    The Navajo Department of Corrections had a duty to use ordinary care in the operation and maintenance of the Shiprock DOC facility.

122.    The Navajo Department of Corrections had a duty to maintain adequate numbers of staff to operate the Shiprock DOC facility to protect the lives, health and safety of people who were detained there.

123.    The Navajo Department of Corrections had a duty to operate and manage the Shiprock DOC facility in conformance with applicable rules, regulations, policies, procedures, and the terms of the 1992 consent decree to protect the lives, health and safety of the people who were detained there.

124.    The Navajo Department of Corrections had a duty to adequately train its staff, including training to ensure compliance with applicable rules, regulations, policies, procedures,

and the terms of the 1992 consent decree to protect the lives, health and safety of the people who were detained there.

125.    The Navajo Department of Corrections, through its administrators, employees, and agents, negligently, recklessly, willfully, or wantonly violated their duties of care by:

    a.    Not having enough staff present to ensure the security, custody, and supervision of inmates and to comply with policies and procedures;

    b.    Not maintaining, or choosing not to use, a suicide-prevention program that includes specific procedures for handling intake, screening, identifying, and continuously monitoring inmates who are at risk of suicide;

    c.    Not determining whether Derek Harrison required immediate medical or psychiatric attention upon his arrival at the Shiprock DOC;

    d.    Not having Derek Harrison undergo a mental health evaluation or suicide risk assessment by health-trained staff or qualified health care personnel upon his arrival at the Shiprock DOC;

    e.    Not making an emergency referral to the Indian Health Service for evaluation by a healthcare professional;

    f.    Not placing Derek Harrison on a "suicide watch" involving continuous monitoring upon his arrival at the Shiprock DOC despite his express threats to kill himself;

    g.    Not having Derek Harrison seen by a mental health care provider within 72 hours of his arrival, when he should have been placed on suicide watch;

    h.    Not requiring staff to communicate with and continuously monitor Derek Harrison, who was suicidal;

    i.    Not performing five-minute inspection rounds for high-risk inmates;

    j.    Leaving Derek Harrison in a cell with bedsheets that he could use to attempt suicide; and

    k.    Not monitoring closed-circuit television footage of Derek Harrison's cell to ensure he did not attempt suicide.

126.    At all material times, the Navajo Police Department had a duty to exercise ordinary care in its handling of people taken into custody.

127.    The Navajo Police Department, through its administrators, employees and agents, negligently, recklessly, willfully or wantonly violated its duty of care when its officers took Derek Harrison to the Shiprock DOC instead of to an appropriate medical or mental health professional and chose not to adequately communicate with DOC staff about Derek's mental health crisis.

128.    At all material times, the administrators, employees and agents of the Navajo Department of Corrections and the Navajo Police Department were performing work within the scope of work of 638 Contracts.

129.    Defendant USA is liable for the negligent, wanton, reckless, and willful actions and omissions of the administrators, employees, and agents of the Shiprock Department of Corrections and Shiprock Police Department pursuant to 25 C.F.R. § 900.204 and pursuant to the terms of the 638 Contracts between the BIA and the Navajo Nation.

130.    The wrongful acts and omissions of the Navajo Department of Corrections and the Navajo Police Department were a cause of Derek Harrison's death.

131.    It was foreseeable that the wrongful acts and omissions of the Navajo Department of Corrections and the Navajo Police Department would result in the death of Derek Harrison and loss of consortium suffered by Plaintiff Marcella Coolidge.

132.    Defendant USA is liable for those damages recognized under the law, including, but not limited to damages for: wrongful death, lost value of life, pain and suffering, loss of household services, lost earning capacity, funeral expenses, medical expenses, loss of consortium, aggravating circumstances, pre- and post-judgment interest, and other relief as deemed appropriate by the Court.

**COUNT III**
**NEGLIGENT HIRING, TRAINING AND SUPERVISION BY NAVAJO DEPARTMENT OF CORRECTIONS AND NAVAJO POLICE DEPARTMENT**

All previous paragraphs are incorporated herein by reference.

133.   At all material times, the Navajo Department of Corrections was the employer of the DOC staff responsible for the safety and security of inmates at the Shiprock DOC facility.

134.   At all material times, the Navajo Department of Corrections was responsible for ensuring that the Shiprock DOC facility had enough qualified staff to ensure the safety and security of inmates at the facility.

135.   At all material times, the Navajo Department of Corrections was responsible for ensuring that its corrections officers and supervisors received the necessary training and instruction to safely carry out the duties and functions required to protect the lives, health, and safety of inmates at the Shiprock DOC facility.

136.   At all material times, the Navajo DOC had a duty to use ordinary care in hiring, training, supervising, and retaining employees of the Shiprock DOC facility.

137.   Specifically, the Navajo DOC had a duty to train and instruct corrections officers and supervisors to:

    a.    Ensure all inmates are alive and safe while in corrections custody;

    b.    Identify inmates who may be at risk for committing acts of self-harm, including suicide;

    c.    Monitor a suicidal inmate's mental status for behavior that suggests a need for an increased level of monitoring or healthcare, such as hopelessness, anxiety, increasing agitation, or depression psychosis;

    d.    Direct inmates identified as being at risk for committing acts of self-harm to appropriate medical or healthcare personnel, including mental health providers, who may assess and provide necessary care and interventions to such inmates;

    e.    When the necessary medical or mental health care is not available at a facility, to refer inmates to and provide timely access to the necessary services;

    f.      Remove items from the cells of inmates at risk of self- harm that could be used to carry out acts of self-harm, including suicide;

    g.      Place at-risk inmates on suicide watch;

    h.      Continuously observe suicidal inmates;

    i.      Communicate with suicidal inmates; and

    j.      Communicate with the families of suicidal inmates to ensure corrections staff understand the nature of an inmate's suicidal thoughts or actions.

138.    The Navajo DOC violated the standard of ordinary care in hiring, training, supervising, and retaining employees by its actions and omissions, including, but not limited to:

    a.      Not ensuring that the Shiprock DOC facility had sufficient numbers of qualified staff to ensure the safety and security of inmates at the facility;

    b.      Not ensuring that its corrections officers and supervisors received the necessary training and instruction to safely carry out the duties and functions required to protect the lives, health and safety of inmates at the Shiprock DOC facility;

    c.      Not requiring corrections officers to follow rules, regulations, policies and procedures meant to ensure the safety and security of inmates; and

    d.      Not training and instructing corrections officers and supervisors to take the required precautions to prevent suicides described above.

139.    At all material times, the Navajo Police Department had a duty to exercise ordinary care in in hiring, training, supervising, and retaining police officers.

140.    The Navajo Police Department violated the standard of ordinary care in hiring, training, supervising, and retaining employees by its actions and omissions, including, but not limited to its choice not to train officers to send suicidal subjects to an appropriate medical or mental health care professional rather than jail and to thoroughly communicate with detention center booking officers about an arrestee's suicidal ideation or mental health crisis.

141.    At all material times, the administrators, employees and agents of the Navajo Department of Corrections and the Navajo Police Department responsible for hiring, training supervising, and retaining employees of their respective departments were performing work within the scope of work of 638 Contracts.

142.    Defendant USA is liable for the negligent, wanton, reckless, and willful actions and omissions of the administrators, employees, and agents of the Shiprock Department of Corrections and Shiprock Police Department in the hiring, training, supervising, and retaining of employees pursuant to 25 C.F.R. § 900.204 and pursuant to the terms of the 638 Contracts between the BIA and the Navajo Nation.

143.    It was foreseeable that the wrongful acts and omissions of the Navajo Department of Corrections and Navajo Police Department in the hiring, training, supervising, and retaining of employees would result in the death of Derek Harrison and loss of consortium suffered by Plaintiff Marcella Coolidge.

144.    The wrongful acts and omissions of the Navajo Department of Corrections and Navajo Police Department in the hiring, training, supervising, and retaining of employees were a cause of Derek Harrison's death.

145.    Defendant USA is liable for those damages recognized under the law for the Navajo DOC and Navajo Police Department's wrongful actions and omissions in in the hiring, training, supervising, and retaining of employees, including, but not limited to damages for: wrongful death, lost value of life, pain and suffering, loss of household services, lost earning capacity, funeral expenses, medical expenses, loss of consortium, aggravating circumstances, pre- and post-judgment interest, and other relief as deemed appropriate by the Court.

**COUNT IV**
**MARCELLA COOLIDGE'S LOSS OF CONSORTIUM**

All previous paragraphs are incorporated herein by reference.

146.    Plaintiff Marcella Coolidge is the mother of Plaintiff's Decedent, Derek Harrison.

147.    Plaintiff Coolidge and Derek Harrison lived in the same residence at the time of Derek's death.

148.    Plaintiff Coolidge and Derek Harrison shared a close, loving, supportive, and mutually dependent parent-child relationship.

149.    It was foreseeable that Plaintiff Coolidge would be harmed by the death of her son as a result of the wrongful acts of the Defendants.

150.    The acts and omissions of the USA, the BIA, the Navajo DOC, and the Navajo Police Department were negligent, wanton, willful, and/or reckless and directly and proximately caused Plaintiff Coolidge to suffer a loss of consortium.

151.    Defendant BIA is liable for Plaintiff Coolidge's loss of consortium based on its own wrongful conduct.

152.    Defendant USA is vicariously liable for Plaintiff Coolidge's loss of consortium pursuant to 25 C.F.R. § 900.204 and pursuant to the terms of the 638 Contracts between the BIA and the Navajo Nation because the wrongful acts and omissions of the Navajo DOC and Navajo Police Department were a cause of her loss of consortium.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Gabrielle Valdez, as personal representative of the Estate of Derek A. Harrison, and Plaintiff Marcella Coolidge request that judgment be entered in their favor and against Defendants for compensatory damages, including aggravating circumstances, costs of suit, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

Dated: April 6, 2021                    Respectfully submitted by:



**_Michael E. Sievers_**
Randi McGinn
Michael E. Sievers
Christopher T. Papaleo
201 Broadway Blvd. SE
Albuquerque, NM  87102
p: (505) 843-6161
f: (505) 242-8227
Randi@McGinnLaw.com
Mike@McGinnLaw.com
Chris@McGinnLaw.com

**- AND -**

Calvin Lee
C.J. Lee & Associates, P.C.
A 211 W. Mesa, Ste. 2
Gallup, NM  87301
Tele:  (505) 862-9837
Fax:  (505) 213-0578
calvin@indianlaw.mobi